KERWIN HUMPHREY,

Plaintiff,

VERSUS

DIAMANT BOART, INC. AND FESTINAL CO., INC.,

Defendants.
_____

MEMORANDUM AND ORDER
February 13, 2008
_____

JOSEPH F. BIANCO, District Judge:

This is a products liability action in which plaintiff Kerwin Humphrey ("plaintiff" or "Humphrey") has brought suit against defendants Diamant Boart, Inc. ("Diamant Boart") and Fastenal Company, Inc. ("Fastenal")[1] (collectively, "defendants"), in connection with an alleged accident that occurred while Humphrey was using a Quickie Super 60 handheld saw to cut a wooden light pole on September 23, 2005, while he was employed as a Labor Supervisor for the Village of Garden City, New York. Specifically, the Complaint sets forth causes of action for (1) strict liability, alleging the design of the blade guard and the warnings and instructions for the saw's use were defective, and (2) breach of implied warranty, alleging the saw was not reasonably safe for its intended use. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the Court denies defendants' motion for summary judgment in its entirety.

I. BACKGROUND

A. Factual Background

The facts described below are taken from the parties' depositions, affidavits, exhibits and defendants' Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party.[2] *See Capobianco v. City*

---

[1] Fastenal was incorrectly named in plaintiff's Complaint as "Festinal." (*See* Defs.' Joint Notice of Removal, at 1.)

[2] As defendants point out, plaintiff failed to comply with Local Civil Rule 56.1 in that plaintiff

of New York*, 422 F.2d 47, 50 (2d Cir. 2001).

Humphrey was employed as a Labor Supervisor by the Village of Garden City, New York. (Defs.' 56.1 ¶ 5.) He had worked for the Village of Garden City since 1984 and was originally hired as a laborer. (*Id.* ¶ 6.) By September 2005, Humphrey had been promoted to Labor Supervisor, which involved the supervision of a crew of one to two co-employees responsible for, among other things, the replacement and repair of street lights in the Village of Garden City. (*Id.*)

The saw at issue in this case is a Quickie Super 60 handheld portable saw (hereinafter, "saw," "Quickie saw," or "Quickie Super 60 saw") designed and manufactured by EMAK International ("EMAK"), an Italian corporation. (*Id.* ¶ 7.) In April 2001, EMAK sold the saw to Diamant Boart, for resale. (*Id.*) On September 21, 2001, Diamant Boart sold the saw to Fastenal, which was an independent distributor of professional contractors' construction products. (*Id.* ¶ 8.) In April 2002, Fastenal sold the saw to the Village of Garden City. (*Id.* ¶ 9.)

Humphrey began using the Quickie Super 60 saw in 2002 soon after it was purchased by the Village of Garden City. (*Id.* ¶ 10.) He was the sole user of the saw and stored it on his crew truck. (*Id.*) Humphrey was given no formal training as to the operation of the Quickie Super 60 saw or any of the other power equipment he used in his work. (*Id.* ¶ 11.) Moreover, he was not given any formal instruction with respect to the type of blade he should use with the saw when cutting concrete, asphalt, or wood. (*Id.*) Instead, Humphrey learned about the operation of the saw by personal observation of other Village of Garden City employees, starting in 1984 when he was first hired. (*Id.*) Humphrey used the Quickie saw to cut wooden poles two or three times per week for approximately three and one-half years prior to his accident without the saw recoiling or malfunctioning during use. (*Id.* ¶ 12.) According to Humphrey, beginning in 2002 and throughout the three and one-half year period that he used the Quickie saw prior to the accident, he

---

did not file a response to defendants' Rule 56.1 Statement of Facts (hereinafter, "Defs.' 56.1"). "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Here, although plaintiff did not comply with Rule 56.1, plaintiff's written submissions in connection with the cross-motions cite to the relevant portions of the record upon which plaintiff is relying. Thus, both the moving parties and the Court are clearly aware of the portions of the record upon which plaintiff relies in opposition to the motion, and defendants have not identified any prejudice arising from the plaintiff's failure to comply with Rule 56.1. Accordingly, in the exercise of its broad discretion, the Court will not reject plaintiff's opposition based upon his failure to comply with Rule 56.1, but rather has fully considered plaintiff's opposition to defendants' summary judgment motion on the merits. *See, e.g., Photopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 n.2 (2d Cir. 2003) (excusing failure to comply with Local Civil Rule 56.1 where the relevant facts were apparent from the parties' submissions and there was no evidence of prejudice from the defect); *Williams v. R.H. Donnelley Inc.,* 199 F. Supp. 2d 172, 174 n.1 (S.D.N.Y. 2002) (excusing failure to submit statement pursuant to Local Civil Rule 56.1 where the facts were set forth in the party's memorandum of law).

observed that the saw's blade guard would loosen during operation, and Humphrey would stop and re-tighten the guard before continuing its use. (*Id.* ¶ 13.) Humphrey knew that he needed to re-tighten the blade guard because he could actually see the guard rotate back and expose more of the blade. (*Id.* ¶ 14.) Humphrey never advised his employer that the blade guard was loosening during operation, nor did he ever request service or maintenance on the blade guard. (*Id.* ¶ 15.)

At the time of the sale of the saw by defendants, the saw had several on-product warning and instruction labels. (*Id.* ¶ 17.) Among other warnings, the labels on the blade guard of the saw warned the user as follows:

**WARNING**

**FAILURE TO FOLLOW ALL WARNINGS AND INSTRUCTIONS MAY RESULT IN SERIOUS INJURY OR DEATH**

Read entire operator's manual before operating this machine. Understand all warnings, instructions, and contents.

Use only reinforced abrasive or high speed diamond blades having an operating speed above or equal to the maximum spindle speed and specifically designed for use with hand-held, portable, high speed cut off machines.

Do not use damaged or carbide tipped blades.

Machinery hazard – Always keep all guards in place properly adjusted and in good condition.

(*Id.* ¶ 17.) A warning on the top of the saw console repeated the direction to the operator to read the manual before operating the saw. (*Id.*) The operator's manual contained two warnings to the operator not to use carbide tipped blades on the saw. (*Id.* ¶ 18.)

Humphrey observed and was aware of the on-product warnings and instruction labels, but did not read them. (*Id.* ¶ 19.) Humphrey also was aware that the saw had an operator's instruction manual and that on-product labels instructed him to read the manual, but he did not read it. (*Id.* ¶ 20.)

According to the former President of Diamant, the Quickie saw (1) is used by, and marketed to, professional contractors, and (2) is intended to be used to cut hard materials, such as steel, concrete, brick, and asphalt, not to cut soft materials, like wood. (Gustafsson Aff. ¶¶ 10-11, 13.) Moreover, as stated on the label and Operating Instructions, it is intended for use only with diamond and abrasive blades, not carbide tipped blades. (Defs.' 56.1 ¶ 21.)

On September 23, 2005, which was the day of the accident at issue in this case, Humphrey and a two-person crew were removing and cutting up a 20-foot wooden light pole from a parking lot behind the Lord & Taylor building in the Village of Garden City. (*Id.* ¶ 23.) The crew had removed the bolts securing a metal shoe which attached the pole to its concrete base and laid the pole horizontally on the surface of the parking lot to be cut into more manageable pieces. (*Id.* ¶ 24.) Humphrey was using the saw for approximately 8 minutes prior to the accident, during which time he cut the top T bar on the wooden pole off and had cut two section lengths along the top of the pole. (*Id.* ¶ 25.) According to Humphrey, as he began a third

3

cut in the top of the pole, the saw "bound up" in the cut for a "second" and kicked back, striking him in the face. (*Id.*)

B. Procedural History

Plaintiff initially filed the complaint in Supreme Court, County of Nassau, on February 6, 2006, and served the defendants on May 4, 2006. On June 2, 2006, the case was removed to federal court. The defendants answered the complaint on June 9, 2006. On June 29, 2007, defendants moved for summary judgment. Oral argument was held on September 7, 2007.

II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

III. DISCUSSION

In support of their motion for summary judgment, defendants argue the following: (1) the strict liability design defect claim must be dismissed because plaintiff's expert testimony

4

must be precluded due to the expert's lack of qualifications and his unreliable methodology and, absent such testimony, there is no evidence to create a disputed issue of material fact that survives summary judgment; (2) the strict liability failure to warn claim must be dismissed because, among other things, plaintiff did not read the warning label or the operator's manual; and (3) the breach of implied warranty of merchantability claim must be dismissed because plaintiff utilized the saw for an unintended use, *i.e.*, mounting a carbide blade on a masonry saw so it could be used to cut wood. For the reasons set forth below, the Court concludes that summary judgment is not warranted on any of these grounds.

### A. The Design Defect Claim

Strict products liability requires proof that "(1) the product is 'defective' because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; [and] (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care." *Fane v. Zimmer, Inc.,* 927 F.2d 124, 128 (2d Cir. 1991) (quoting *Wolfgruber v. Upjohn Co.,* 423 N.Y.S.2d 95, 97 (N.Y. App. Div. 1979), *aff'd,* 436 N.Y.S.2d 614 (N.Y. 1980)).

"[T]o establish a *prima facie* case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss v. Black & Decker Mfg. Co.,* 463 N.Y.S.2d 398, 402 (N.Y. 1983). In determining whether a design defect existed, an assessment must be made as to "whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* Moreover, the burden is on the plaintiff to present "evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id.* In proving a design defect, plaintiff may rely on circumstantial evidence, including the occurrence of the accident, to show that the product did not function as intended. *See Dubecky v. S2 Yachts, Inc.,* 651 N.Y.S.2d 602, 603 (N.Y. App. Div. 1996).

Plaintiff asserts in his Complaint that the Quickie Super 60 saw was defective in design. Specifically, the expert's report for plaintiff identifies, *inter alia,* the following defects: (1) the blade guard is defective because the locking knob was positioned too close to the arbor shaft, was difficult to tighten, and loosened during operation; and (2) the saw's on-product warning and instruction labels are defective because they did not warn a user, among other things, that the saw could "kickback." Defendants argue that plaintiff's design defect claim must fail because the only basis for any disputed issue of fact on the claim is the expert opinion of Dr. Jeffrey Ketchman, P.E. ("Ketchman"), which defendants contend is inadmissible under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) because Ketchman is unqualified and his methodology is unreliable. As set forth below, the Court disagrees and finds that his opinion is admissible under

*Daubert* and is sufficient to create material issues of fact on the design defect claim.[3]

In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence. *See Nora Beverages, Inc., v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998) (stating that on summary judgment motion, "[a] district court properly considers only evidence that would be admissible at trial"); *accord Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 53 (2d Cir. 1993). Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

> Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997) (internal citations and footnotes omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Raskin,* 125 F.3d at 66. Thus, if the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district

---

[3] Although a Rule 104(a) pretrial evidentiary hearing is often necessary to address *Daubert* issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues and, thus, can be decided based on the written submissions and evidence. *See generally* Michael H. Graham, 2 *Handbook of Fed. Evidence* § 702.5 (5th ed. 2002) ("In light of the Supreme Court's emphasis of broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function."). Here, neither party requested such a hearing. Moreover, the objections to the expert testimony dealt with his qualifications and his methodology and raised legal arguments based on undisputed facts about such qualifications and methodology. Thus, these *Daubert* issues could be decided based on the written record, which included the expert's curriculum vitae, expert report and deposition. Accordingly, the Court determined that a hearing was unnecessary under the particular circumstances of this case. *See, e.g., Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 248-49 (6th Cir. 2001) (holding that district court was not required to hold *Daubert* hearing before excluding evidence); *Oddi v. Ford Motor Co.,* 234 F.3d 136, 154-55 (3d Cir. 2000) (rejecting argument that *Daubert* hearing was required where court had reviewed record which included two depositions, a declaration, and an expert report); *see also Colon v. BIC USA, Inc.,* 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion.").

court on a record that does not contain that evidence. *Id.* at 66-67. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142-43 (1997). Accordingly, pursuant to Rule 104 of the Federal Rules of Civil Procedure, the court must examine the admissibility of plaintiff's expert testimony in ruling on defendants' motion for summary judgment.

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *see Daubert*, 509 U.S. at 593 n.10, the district court is the ultimate 'gatekeeper.'" *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007). Under *Daubert*, the district court must perform the gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) (holding that whether the witness' area of expertise was technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York,* 414 F.3d 381, 396 (2d Cir. 2005) ("The shift under the Federal Rules to a more permissive approach to expert testimony . . . did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely*, 414 F.3d at 396-97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *accord Nimely,* 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience,

7

training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.,* 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness'[] background when evaluating the witness'[] qualifications to testify as an expert.'") (quoting 29 Wright & Gold, *Fed. Prac. & Proc.* § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.,* No. CV-03-0710 (TCP) (ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997).

With respect to reliability, "'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *Williams,* 506 F.3d at 160 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir. 2002) (internal quotation marks omitted)). As the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos,* 303 F.3d at 266 (citations and internal quotations omitted); *accord Nimely,* 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *Kumho*, 526 U.S. at 151; *Nimely,* 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co.,* 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos,* 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, . . . by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the

evidence standard. *See Daubert,* 509 U.S. at 592 n.10 ("These matters should be established by a preponderance of proof.") (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987)); *see also* Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility."); *accord Baker v. Urban Outfitters, Inc.,* 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003) (same).

Although defendants argue that Ketchman's opinion should be excluded because he is unqualified, the Court disagrees. Ketchman has a Bachelor's Degree and a Master's Degree in Mechanical Engineering from City College of New York and Ohio University, respectively. (Defs.' 56.1 ¶ 27; Defs.' Exh. L.) He also has a Ph.D. in Engineering Science from Columbia University. (*Id.*) He has been a licensed and registered professional engineer in the State of New York since 1974 and is a member of several professional organizations including, among others, ACTAR ("Accredited Traffic Accident Reconstructionist"), American Society of Mechanical Engineers, and the American Association of Testing and Materials. (Defs.' Exh. L.) Since 1985, he has been self-employed as an engineering consultant and, in that capacity, analyzes accidents and evaluates the safety of, or malfunctions of, various products. (Defs. 56.1 ¶¶ 27-28.) As an Engineering Consultant, Ketchman has participated in designing among other things, exercise bicycles, bowling balls, ski bindings, bakery equipment, dough-moving equipment, tire-buffing blades, power generators, electro-mechanical relays, lighting fixtures, submarine sonar equipment, and tennis rackets. (*Id.* ¶ 30.) Ketchman has worked on machine guarding in several instances, including the following: (1) containment of interior pulleys and cable drums on submarine sonar equipment; (2) guarding tobacco leaf cutting on a stationary conveyor belt; (3) guarding a stationary punch press; and (4) guarding springs on a hand exerciser. (*Id.* ¶ 32.)

Based upon this educational and professional experience, the Court concludes that Ketchman is sufficiently qualified to render an expert opinion regarding machine-guarding for a handheld power saw. Defendants' argument regarding his qualifications is based upon his lack of any specific educational or professional experience relating to the analysis of power saws. As noted above, although he does not have specific experience with power saws, Ketchman does have prior experience with designing and analyzing guards for blades, including tobacco processing equipment and cable-cutting equipment. Thus, the Court concludes that his generalized engineering education and experience, combined with his specific work on machine guarding in several instances, qualifies him to testify with regard to guarding on power saws, despite his failure to have any particular expertise in saws. Under these circumstances, the expert's lack of experience with saws goes to the weight of his testimony, not its admissibility. *See, e.g., McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) ("[Defendant's] quibble with [the expert's] academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the

fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility – not its admissibility."); *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir. 1991) ("In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."); *Santoro v. Donnelly,* 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) ("The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience."); *Bunt v. Altec Indus. Inc.,* 962 F. Supp. 313, 317 (N.D.N.Y. 1997) ("Liberality and flexibility in evaluating qualifications should be the rule . . . [T]he expert should not be required to satisfy an overly narrow test of his own qualifications.") (citation and quotation marks omitted); *Lappe v. Am. Honda Motor Co.,* 857 F. Supp. 222, 226-27 (N.D.N.Y. 1994) ("Where an expert has the education or background to permit him to analyze a given set of circumstances, he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture.") (citation and quotations omitted) (collecting cases), *aff'd*, 101 F.3d 682 (2d Cir. 1996); *accord Pinchkney v. Zep Mfg. Co.*, No. 94 Civ. 0742 (RSP/GJD), 1997 WL 204903, at *2 (N.D.N.Y. April 15, 1997). Accordingly, the Court rejects defendants' argument that Ketchman's testimony should be excluded because he is unqualified.

Defendants' second argument regarding plaintiff's expert – namely, that his opinions are inadmissible because they are unreliable – is similarly unavailing. The focus of defendants' contention regarding Ketchman's methodology is that he purportedly only conducted a cursory examination of the saw at issue before reaching his conclusion. Dr. Ketchman's testified at his deposition that he inspected the subject saw, manipulated the locking mechanism on that saw, and observed the saw in operation. Based upon that inspection, he concluded that the locking mechanism on defendants' saw was improperly placed on the saw and that it was not of the type that could not withstand the vibration of the hand saw. He also ran a new Homelite portable handheld construction saw and manually tightened and loosened the locking knob on the Homelite saw several times. Ketchman also had an employee of InterCity Testing, where the Homelite saw was located, tighten and loosen the Homelite knob several times. Based upon this comparative testing, Ketchman concluded that the locking system of the Homelite saw was an alternative, non-defective, and appropriate locking system.

Defendants argue that his methodology was flawed in a number of ways, including, among other things, not reconstructing the circumstances surrounding plaintiff's accident, not quantifying the torque necessary to tighten the guard on the Quickie saw, not constructing a model of the locking mechanism that he proposed, and not studying the effectiveness of the locking system under actual use. (Defs.' Mem. of Law, at 20-21.) However, the Court does not view any of these alleged deficiencies in testing and methodology sufficient to render Ketchman's opinion inadmissible under *Daubert*. Specifically, the Court has reviewed Ketchman's report, as well as his deposition, in which he explained (1) that he inspected and tested the saw at the Garden City Department of Public Works maintenance

facility and visited the accident location; (2) that Humphrey accompanied him, described the accident circumstances, and identified the subject saw that was being used at the time of the accident; (3) that he tested and inspected the saw and, while it was running, observed, among other things, the movement of the blade guard after being tightened due to saw vibration; and (4) he inspected and tested the Homelite Saw and concluded that its design made tightening the guard easier and more effective and allowed lower clamping force for equivalent resistance to loosening. In short, Ketchman's description of his testing and methodology, which formed the basis for his conclusions, are sufficiently reliable under *Daubert* to allow his opinions to be admitted. Although defendants criticize Ketchman's lack of testing as to an alternative design, such testing is not required to establish feasibility if the expert can point to an existing design in the marketplace, which Ketchman in fact did with respect to the Homelite. *See, e.g., Bah v. Nordson Corp.*, No. 00 CIV 9060 (DAB), 2005 WL 1813023, at *8 (S.D.N.Y. Aug. 1, 2005) ("[T]he interlock switch and nozzle diffuser proffered by Dr. Storace do exist in the marketplace in products similar to the subject machine that he helped design, and thus testing is not needed to establish their feasibility.").

In sum, the Court recognizes that defendants have pointed to potential flaws in Ketchman's methodology. However, given that there is sufficient indicia of reliability to allow its admission, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citations and quotations omitted); *accord Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable").

Given the admissibility of plaintiff's expert testimony, combined with the evidence in the record regarding the circumstances of the accident, plaintiff has created an issue of material fact, regarding whether the saw was not reasonably safe due to a design defect and whether feasible alternative designs existed at the time of manufacture, that survives summary judgment. *See, e.g., Torres v. Pept Inv. Corp.,* 767 N.Y.S.2d 351, 351-52 (N.Y. App. Div. 2003) ("Defendant did not meet its burden of establishing its entitlement to judgment as a matter of law on the issue whether the saw was unreasonably dangerous for its intended use as a result of an inadequate blade guard."); *Ganter v. Makita U.S.A., Inc.,* 737 N.Y.S.2d 184, 185 (N.Y. App. Div. 2002) ("[T]he affidavit of plaintiff's engineer raises issues of fact whether the table saw was not reasonably safe due to a design defect and whether there were feasible alternative designs at the time of manufacture"); *Sanchez v. Otto Martin Maschinenbau GmbH & Co.,* 722 N.Y.S.2d 140, 141 (N.Y. App. Div. 2001) (finding summary judgment to be unwarranted because plaintiff raised "issues of fact as to whether the subject saw was affected by a design defect were raised by the contention of plaintiff's expert that the saw should have been equipped with an 'over the arm or Brett Guard' which would have allowed non-through cuts without its removal").

B. The Failure to Warn Claim

Defendants argue that the plaintiff's failure to warn claim cannot survive summary judgment because plaintiff testified at his deposition that (1) he was aware that the blade guard rotated back during use for more than

three years prior to the accident, and (2) he did not read the warnings on the saw or the operator's manual. (Defs.' Mem. of Law, at 23.) As set forth below, the Court disagrees and finds that there are material issues of disputed fact on this claim that preclude summary judgment.

With respect to failure to warn claims, there is no distinction between the *prima facie* elements under New York law of such a claim regardless of whether it is sounding in negligence or strict liability. *See Martin v. Hacker,* 83 N.Y.2d 1, 8-9 n.1 (N.Y. 1993). Therefore, under New York law, in order to make a *prima facie* case for failure to warn, a plaintiff must show the following: (1) the manufacturer had a duty to warn; (2) the manufacturer breached the duty to warn in a manner that rendered the product defective, *i.e.,* reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir. 1997) (citing *Becker v. Schwartz,* 413 N.Y.S.2d 895, 899 (N.Y. 1978)); *see also Mustafa v. Halkin Tool, Ltd.,* No. 00-CV-4851, 2007 WL 959704, at *17 (E.D.N.Y. Mar. 29, 2007).

It is well-settled that a manufacturer has a duty to warn (1) "against latent dangers resulting from foreseeable uses of its product of which it knew or should have known," and (2) "of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano v. Hobart Corp.* ("*Liriano I*")*,* 92 N.Y.2d 232, 237 (N.Y. 1998). "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances." *Billiar v. Minn. Mining and Mfg. Co.,* 623 F.2d 240, 247 (2d Cir. 1980) (citing *Rainbow v. Albert Elia Bldg. Co.*, 373 N.Y.S.2d 928, 931 (N.Y. App. Div. 1975) ("[R]ecovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of the facts of what constitutes reasonable warning under all the circumstances") and *Young v. Elmira Transit Mix, Inc.,* 383 N.Y.S.2d 729, 731 (N.Y. App. Div. 1976)). Moreover, the New York Court of Appeals has described the standard for evaluating "failure-to-warn" liability as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano I*, 92 N.Y.2d at 243. Given this fact-intensive inquiry, as the Second Circuit has emphasized, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.,* 114 F.3d 359, 366 (2d Cir. 1997) (citing *Beyrle v. Finneron,* 606 N.Y.S.2d 465, 466 (N.Y. App. Div. 1997)); *see also Liriano v. Hobart Corp.* ("*Liriano II*")*,* 132 F.3d 124, 131 (2d Cir. 1998) (stating that courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer, in fact, has a duty to warn") (citations omitted); *Johnson v. Johnson Chem. Co.,* 588 N.Y.S.2d 607, 610 (N.Y. App. Div. 1992) ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.") (citations omitted); *Cooley v. Carter-Wallace Inc.,* 478 N.Y.S.2d 375, 376 (N.Y. App. Div. 1984) ("The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial.").

However, there are certain circumstances where failure to warn claims can be decided as a matter of law: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious"; or (2) where the hazards are "patently dangerous or pose open and obvious risks." *Liriano I*, 92 N.Y.2d at 241; *accord Bah,* 2005 WL 1813023, at *14.

In the instant case, there is no basis to bar the failure to warn claim as a matter of law. A review of the record reveals that there are material issues of fact that preclude such a determination in this case under the summary judgment standard. Specifically, plaintiff contends, through his expert, that the warnings on the saw guard and in the Operating Instructions did not conspicuously state the hazards associated with the saw, including tooth separation/fracture and kickback, and were misleading with regard to the potential risks associated with the use of the incorrect blade. In support of this claim, Dr. Ketchman stated in his report:

> First, the warning to be proper, must be conspicuous and state the associated hazard(s). In this case possible hazards are tooth separation/fracture and kickback – neither of which is addressed by the warning on the saw guard, or in the OPERATING INSTRUCTIONS. By contrast, the kickback hazard and it [sic] means of avoidance are described in the Homelite Manual on page 18.
>
> Secondly, the warning on the guard and the associated pictogram, which shows a broken blade, mixes with it the warning about carbide-tipped blades, rather than clearly separating the two. There is ample space on the label . . . to include a separate conspicuous and proper warning against using toothed or carbide-tipped blades. This is particularly important because similar saws made by other manufacturers <u>allow</u> the use of carbide-tipped blades in certain special circumstances . . . and frequent users of such equipment, such as Public Works Departments, encounter a variety of brands over time, and can be expected to transfer usage experience across brands of substantially similar products.

(Ketchman Report, at 6-7). Based upon this report and the circumstances surrounding the alleged accident and use of the saw, there are issues of fact on this claim that must be decided by a jury.

Although defendants argue that plaintiff's claim must fail because plaintiff admitted in this deposition that he had observed the blade guard loosen and rotate back on other occasions prior to the accident, the Court disagrees. As a threshold matter, plaintiff disputes that he was fully aware of the hazard created by the loosening blade guard because, on prior occasions, he was able to safely tighten it as it loosened. (Humphrey Dep., at 100.) In any event, plaintiff's claim here is not limited to the loosening of the guard blade in isolation; rather, it is also based on the failure to adequately warn that the carbide-toothed blade was not recommended and could cause kickbacks. Plaintiff testified in his deposition that he was unaware that using carbide-tipped blades posed a hazard. (Humphrey Dep., at 105.) Moreover, there was no testimony that he was aware that the carbide-tipped blades could cause a kickback. In essence, plaintiff's claim is that he was unaware of the combination of hazards

13

created by the use of the saw. Given these factual circumstances, the Court cannot conclude as a matter of law based upon the undisputed facts that plaintiff was fully aware at the time of the accident of all the hazards associated with the saw that he now claims caused his accident. Therefore, summary judgment on such grounds is unwarranted.

Defendants' summary judgment motion on this claim is also premised on their contention that, because plaintiff conceded in his deposition that he did not read the warning label or the Operating Instructions, he cannot recover on his failure to warn claim as a matter of law. However, as outlined below, that contention is similarly unpersuasive because a plaintiff's admission that he did not read the warning label or Operating Instructions is not necessarily dispositive under New York law in connection with a failure to warn claim.

First, a plaintiff may be able to argue that the warnings, in addition to being substantively inadequate, were insufficiently conspicuous or prominent and, thus, be able to overcome his or her failure to read them. *See, e.g., Derienzo v. Trek Bicycle Corp.,* 376 F. Supp. 2d 537, 568 (S.D.N.Y. 2005) ("While it is true that, in many cases, a plaintiff who admits that he failed to read a warning that was issued with the product will have failed to show that any deficiency in that warning was the proximate cause of his injuries, plaintiff's failure to read an insufficiently conspicuous or prominent warning will not necessarily defeat the causation element of a failure to warn claim."); *Anderson v. Hedstrom Corp.,* 76 F. Supp. 2d 422, 443 (S.D.N.Y. 1999) (hereinafter, "*Hedstrom*") ("[T]he location and conspicuousness of the warnings (whether that be based on label or letter size, color, or other attributes of conspicuousness), and the role those factors played in the plaintiff's failure to read them, as well as the content and clarity of those warnings, are disputed issues in this case, and the plaintiff's failure to read the warnings should not, in and of itself, prevent the 'failure to warn' claim from going before the jury."); *German v. Morales,* 806 N.Y.S.2d 493, 494 (N.Y. App. Div. 2005) ("A jury could reasonably conclude, on the basis of the warnings that the expert asserts should have been included on the label, that the warnings that were included were inadequate and inconspicuous. Under such circumstances, a manufacturer who provides insufficient warnings cannot avoid liability solely because the plaintiff did not read the warnings that were provided."); *Johnson*, 588 N.Y.S.2d at 612 ("[W]e conclude that [plaintiff's] admitted failure to read the manufacturer's warnings . . . does not necessarily sever the causal connection between the alleged inadequacy of those warnings, on the one hand, and the occurrence of the accident, on the other."); *Darsan v. Guncalito Corp.,* 545 N.Y.S.2d 594, 596 (N.Y. App. Div. 1989) (holding that plaintiff's claim that machine was defective due to failure to display warnings with "sufficient prominence" raised fact issue precluding summary judgment).

Second, a plaintiff also may be able to prevail under New York law with respect to his failure to warn claim, even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party, such as fellow workers or an employer, and they would have informed him of those warnings. *See, e.g., Power v. Crown Controls Corp.,* 568 N.Y.S.2d 674, 676 (N.Y. Sup. Ct. 1990) ("[I]f a proper warning had been given, it could have come to the attention of officials of plaintiff's employer or perhaps even fellow workers, who could have informed plaintiff of what he had not personally read. It is a fact of

modern industrial life that safety directives are made general knowledge in just this fashion."), *rev'd on other grounds,* 596 N.Y.S.2d 38 (N.Y. App. Div. 1993); *see also Sorto-Romero,* No. 05-CV-5172 (SJF) (AKT), 2007 WL 2816191, at *12 (E.D.N.Y. Sept. 24, 2007) ("[I]n light of Plaintiff's inability to read the warnings, Plaintiff may be able to prove causation whereby a third party may have conveyed the warning to him."); *Mustafa,* 2007 WL 959704, at *19 ("At least three New York courts have allowed failure to warn claims to go to a jury under the theory that 'if a proper warning had been given, it could have come to the attention of officials of plaintiff's employer or perhaps even fellow workers, who could have informed plaintiff of what he had not personally read.'") (collecting cases); *accord Hedstrom,* 76 F. Supp. 2d at 444-45.

In the instant case, as described above, plaintiff, through his expert, has cited to alleged inadequacies in the substance of the warnings on the saw, as well as its inconspicuousness relating to, among other things, the pictogram. In fact, Humphrey testified in his deposition that he would not be able to read the warning label on the saw without his reading glasses. (Humphrey Dep., at 102-03.) Moreover, although defendants contend that Humphrey's employers or co-workers would have never relayed any warnings to him because they continue to use carbide-tipped blades in its saws since the accident, the Court finds this argument insufficient to warrant summary judgment. Humphrey testified in his deposition that he learned how to use these types of saws from his supervisors demonstrating to him how to use similar saws over the course of his twenty years of employment with the Village. The fact that the Village still used carbide-tipped blades after the accident does not necessarily suggest that any additional warnings or instructions would never have been relayed to plaintiff. In short, these factual issues as they relate to the conspicuousness and substance of the warnings, and whether Humphrey's employer or co-workers would have conveyed to him any additional warnings that plaintiff claims should have been utilized to make the warnings adequate, cannot be decided under the circumstances of this case as a matter of law on summary judgment, but rather need to be submitted to a jury.

C. Breach of Implied Warranty Claim

Defendants also have moved for summary judgment on plaintiff's breach of warranty claim.[4] Specifically, defendants argue a breach of the implied warranty of merchantability claim because the plaintiff was not using the saw for an intended use. As set forth below, the Court finds there are

---

[4] At oral argument, counsel for plaintiff clarified that plaintiff was not pursuing a claim for implied warranty for a particular purpose under New York Uniform Commercial Code § 2-315, but rather was only asserting a claim for breach of the implied warranty of merchantability under New York Uniform Commercial Code § 2-314(1). Defendants argue in their reply papers that plaintiff should not be permitted to proceed on this theory because such theory was not clear from the Complaint. (Defs.' Reply Br., at 10.) Although the Complaint was not a model of clarity and made allegations regarding representations by defendants to the general public (thus suggesting a claim under § 2-315), it was sufficient to put defendants on notice of a breach of warranty claim under § 2-314 by, among other things, its reference to breach of "warranties" and its allegation that the "saw was not reasonably safe and fit for its intended use." (Complaint ¶¶ 15, 19.) Moreover, the factual issues surrounding such claim by plaintiff were certainly the subject of discovery and defendants are not prejudiced by any alleged lack of clarity as to this claim in the Complaint.

15

disputed issues of material fact on this claim that preclude summary judgment.

The implied warranty of merchantability is governed by New York Commercial Code § 2-314(1), which provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y.U.C.C. § 2-314(1). In order for goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." N.Y.U.C.C. § 2-314(2)(c). Therefore, "[t]o establish that a product is defective for purposes of a breach of implied warranty of merchantability claim, a plaintiff must show that the product was not reasonably fit for its intended purpose, an inquiry that focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Wojcik v. Empire Forklift, Inc.,* 783 N.Y.S.2d 698, 701 (N.Y. App. Div. 2004) (internal quotations and citations omitted); *accord Denny v. Ford Motor Co.,* 639 N.Y.S.2d 250, 258-59 (N.Y. 1995). "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation." *Denny,* 639 N.Y.S.2d at 256 n.4 (quotations and citation omitted). Instead, recovery for breach of the implied warranty of merchantability is warranted "upon a showing that the product was not minimally safe for its expected purpose." *Id.* at 256.

In the instant case, although defendants contend that plaintiff was using the saw for an unintended use by mounting a carbide blade on the saw and cutting wood, there are disputed issues of fact as to whether plaintiff was using the saw in a reasonably foreseeable manner. *See, e.g., Factory Assocs. & Exporters, Inc. v. Lehigh Safety Shoe Co. LLC,* No. 05-CV-837, 2007 WL 1834599, at *9 (N.D.N.Y. June 26, 2007) ("While the evidence in support of such a [breach of warranty] claim is scant, when viewing it in the light most favorable to Plaintiff and drawing every reasonable inference in its favor, there is enough for Plaintiff to survive summary judgment of the claim."); *Beneway v. Superwinch, Inc.,* 216 F. Supp. 2d 24, 30 (N.D.N.Y. 2002) (denying summary judgment on breach of warranty claim where "there are genuine issues of material fact regarding whether the Husky 10 was being used in a foreseeable manner"); *Pinchkney*, 1997 WL 204903, at *9 (denying summary judgment on implied warranty of merchantability claim). Accordingly, summary judgment on the breach of implied warranty claim is denied.

IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 13, 2008
Central Islip, NY

\* \* \*

Plaintiff's attorney is Joseph E. Soffey, Esq., of Soffey & Soffey LLC, 226 Seventh Street, Garden City, NY 11530. Defendants' attorneys are George S. Hodges, of Hodges Walsh & Slater, LLP, 75 S. Broadway, Suite 415, White Plains, NY 10601, and Mary L. Barrier, of Stinson Morrison Hecker LLP, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106.